The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court is in session. Today's case will be called as previously announced and the times will be as allotted to counsel. The case today is Juwanis Perry v. Lewis Spencer et al. Appeal number 16-2444. Attorney Greenfield, please introduce yourself for the record and proceed with your argument. Daniel Greenfield May I please the court? Daniel Greenfield on behalf of plaintiff appellant Juwanis Perry. With the court's permission, I would like to reserve five minutes rebuttal time. Attorney General You may. Daniel Greenfield Thank you. For at least 15 months, Juwanis Perry, a mentally ill prisoner, was held in a windowless cell in a solitary confinement cell, so cramped that he could touch both sides at once. As judges, justices, and scientists have all warned, such confinement has long been understood to inflict devastating psychological and physical harms, particularly on those who, like Mr. Perry, suffer from mental illness. And to protect against those ravages, courts have, for decades, relied on the due process clause to ensure that prolonged solitary confinement is not unnecessarily imposed. It is important to emphasize that the procedural guardrails specified in Wilkinson v. Austin, Greenholtz v. Nebraska, and Hewitt v. Helms do not limit correctional officials' ability to hold prisoners in solitary confinement when they deem such isolation necessary or appropriate. Those protections merely ensure that such a severe and dangerous condition of confinement is not imposed without affording the person enduring it a meaningful opportunity to challenge a decision to hold them under conditions that Justice Sotomayor memorably likened to a penal tomb. Mr. Perry, though, as the panel recognized, did not have that opportunity. He was not meaningfully involved in the review process, had no genuine means of appealing, contesting, or testing the purported basis for his continued solitary confinement. Mr. Perry was never- Counselor, was your client given notice, though, of the particular charges? I don't think the word meaningful, so I'm trying to- you seem to be drawing a line between actual events and meaningless events. Your Honor, for approximately the first year of Mr. Perry's solitary confinement, his classification reviews provided him no robust explanation for the defendant's rationale for holding him in solitary confinement. Was he given a lack of robust explanation for why he was being held? Yeah, the reason I say that, Your Honor, is because he was under some vague understanding that he was being held in solitary confinement because defendants believed that his underlying conviction in criminal conduct was gang-related. And that is shown in the record where Mr. Perry and his criminal defense attorney are marshalling statements from the Commonwealth's prosecuting body and from the criminal sentencing court's record indicating that- Counselor, we're trying to figure out what the duty of the institution is. It would be helpful if you could tell us what they did. Did they give him notice, would be the first question. And what kind of notice did they give him? What did they say to him? What happened? On that point, Your Honor, the record indicates that in Mr. Perry's first classification hearing, he did not know the reason for his assignment to solitary confinement. There is nothing in the record to indicate that Mr. Perry was apprised of defendant's specific reasons to hold him in solitary confinement, although the record does indicate that he had a vague understanding conveyed to him. It's not clear when that he was in solitary confinement because defendants believed his underlying conviction was gang-related. You keep talking in terms of what he understood. I think what we're trying to find out, or at least as I understand the question, is viewing the evidence in the light most favorable to your client. What did they tell him? If the record is silent, you can say that, but we just want to know, we're trying to figure out what the duties of the institution would be and what exactly happened here. Your Honor, I think the record is silent as to what they told him, and so drawing the inference in the light most favorable to Mr. Perry, all he knew at that time was that it was gang-related. There is nothing in the record. Let's look at his December 17th first classification hearing. The record of that reveals no discussion of the rationale for his solitary confinement, and in fact, you see thereafter that the documentation was so substance-free that Lori Cressy, a second-level decision-maker, wrote an email saying, I need more information than what you have given me. You have an inmate in SED being recommended for transfer based on FCG protection issues, but there is nothing from the classification board other than that he has FCG protection issues. What are they exactly? And Defendant Mendoza then responds, per our earlier conversation, changes were made to the board's recommendation rationale as well as adding information to the narrative, but importantly, that information was not conveyed to Mr. Perry. Is that the anonymous comment about his relationship to the gang, etc.? That may be a reference to that, Your Honor. The record is unclear. But there's record evidence about the anonymous playing a role in the classification? There is, Your Honor. And so I thought your argument was that, viewing the light most favorable to your client, the record could be read to say that information that was critical in the determination to place him in solitary, and that was part of the decision-making process at the time of the assignment, was never conveyed to him, or even a version of it conveyed to him. Is that right? Yes. That's what I'm saying. At the time of the initial decision to classify him to solitary confinement, he was not aware of that communication from the anonymous informant. And I just want to be clear that the sentence may well have been justified in holding Mr. Perry in solitary confinement. The point is that they needed to provide him enough basis, enough notice, so that he could explain to them why he did not deserve to be in solitary confinement. Mr. Greenfield, I believe what the record shows is that on December 17th, a classification board hearing was held. He was informed prior to that hearing, he was being held for STG-related issues. He was not informed of the informant's letter. I don't believe that he was informed that the only reason they were considering the STG-related issues was his prior conviction. There's nothing in the record to support that. So let's assume he got notice before that hearing. He did get a hearing. He was present there. So is your due process issue that they did not reveal to him the informant's letter? No, Your Honor. My contention is that Mr. Perry had only a vague understanding that he was being held in solitary confinement related to STG issues, but he did not understand the basis of that STG designation, and had had no previous opportunity to appeal it. So once the defendants decided to hold him in solitary confinement on that basis, they really afforded him no opportunity to show that he did not belong in solitary confinement. Excuse me. I believe the record shows that there was the December 17th hearing of which he was given notice. The notice was STG-related issues. He was not told of the informant's letter. On January 6th, he then filed grievances saying the decision was based on incorrect STG information. Okay? I understand your argument is that the grievance procedure should not be counted as part of the opportunity to be heard. That's an issue of law. I also understand you to argue that notice to his counsel also does not count for purposes of the due process obligation. Am I correct as to both of those arguments? That's right, Your Honor. And here's why I think that that's the correct statement of law. The due process requirement is additive upon any grievance process that any prison has. And if you look at cases like Wilkinson or this court's decision in Roe v. Five minutes remaining. Thank you. The plaintiffs in those cases had also submitted grievances, but neither this court nor the Wilkinson court took those grievances into account for evaluating the due process. And importantly, just sticking with grievances for a moment, if I might, Judge Lynch, many of the grievances were returned as non-grievable, but in the main, even those that were not returned did not provide him with any meaningful information regarding the basis of his solitary confinement or what he could do to modify his behavior to earn his way out of solitary confinement. Like Judge Thompson, I'm trying to understand exactly what you believe. And you may be correct, the due process requirements are. So the grievance he filed on January 6th was denied on January 31st. He said it's based on incorrect information. So you say the obligation in the denial imposed by the due process clause is not merely to deny, but to specify the information on which the denial is based and in addition to inform him of the steps that he needs to take in order to move out of this confinement? Is that the argument? Correct, Your Honor, but I think it would be useful to share the language from the grievance denial itself. It says, grievance denied. Her staff interviewed you as they made aware of your current placement. Now, that is a substance-free response that certainly doesn't inform him of what he could do to earn his way out of solitary confinement, doesn't so give him a guide for future behavior as Wilkinson and Greenholz discussed. It doesn't even really provide him with very much notice about the basis for his solitary confinement. And the grievance responses by and large are similar to that. The subsequent grievance response was you're being held in accordance with 103 CMR 4238 Special Management. Pending transfer as you're being screened for out-of-state placement. Now... Can we go back just a little bit, please? Yes. I just want to simplify this here. Is your first contention that the notice given him about his assignment was inadequate? You're saying the notice was inadequate. Is that correct? Yes, Your Honor. And are you saying also that he was denied an opportunity for a hearing? No. I'm not saying that he was denied an opportunity for a hearing. I want to be clear. He attended three hearings over the course of his solitary confinement. You're complaining that he wasn't allowed to speak. Right. At the first hearing, Your Honor, the record indicates that he did not say anything. A year later, you see an appeal after a second classification hearing. So after he had been in solitary confinement for a year is our first evidence in the record that he was permitted to give a statement to defendants at the hearing, whether written or verbal. But the first hearing, so that first 12-month period, there is nothing in the record indicating that. And Mr. Perry's evidence is that he was not permitted to speak at that hearing, was not permitted to offer a statement. And now, he may be wrong, and defendants shortly made should have an opportunity to prove that he is wrong on remand. But in summary judgment, the evidence is that he did not have an opportunity, at least for the first year, to talk to the defendants. You can continue to answer this. To convey to the officials responsible for his solitary confinement that he did not belong there. And just to finish that answer, the officials at that hearing where he appeared did not even have the final say-so. So if you look at the first hearing, there was a recommendation for him to be assigned to general population. That's December 17, 2010. Mr. Perry agreed with that recommendation, so would have had no reason to appeal it. That was subsequently reversed by Lori Cressy in a decision that was not appealable. So for the first year, at least, the process really falls very short. I do want to address with you, which means we're going to end up going over time, but we've spent our time so far discussing the process side of it. But the antecedent issue is the existence of the state creative liberty interest. So could you address that in two respects? One, how do we think about, well, actually, I guess there's three points I'd like you to address. What is, how would you articulate the way to understand the liberty interest? How can it be articulated in a way that would make it clearly established at the time that he had one that was violated? And then a particular thing that I'm not entirely clear on is what is the relationship between the timing of when the hearing must be held and a durational-based definition of the liberty interest? Do you follow the last point? I do. So if you could address those three issues. Sure. Sure. So the liberty interest calculus as set forth, for example, by Wilkinson v. Austin examines the conditions that a prisoner endures in solitary confinement and compares those to a baseline. And Mr. Perry's solitary confinement was extreme, irrespective of the baseline chosen. With respect to that, could you just help me figure out what are some of the baselines that I could look at? Sure. One is the general population. I'm fairly confident that this is, you know, quite worse than the general population. If I compare it to, if I understand it, there's DDU, which is the disciplinary form of detention. Is that right? In Massachusetts, yes. And then there's DSU, which is the departmental segregation form of detention. Correct. And then there's awaiting action detention. Are those the three forms? I believe awaiting action detention is subsumed into SMU detention, but I may be incorrect on that. Okay. So one way, so how am I supposed to think about it if I think the baseline isn't general population? I understand there's arguments that it is, but if I thought it wasn't that, how am I if that's not the right baseline? Well, Your Honor, I think Wilkinson is a good guide in that respect. The court there examined solitary confinement endured by the plaintiffs in that case and said that it would be, that it was more extreme, that it was an atypical and significant hardship irrespective of the baseline. And in Mr. Perry's hallmarks, there are all of the conditions that issue in Wilkinson and where they diverge, they are more extreme. So if you wanted to compare Mr. Perry's solitary confinement, say, to the DDU or the DSU, I think the evidence would show that his solitary confinement was more extreme. He was in a windowless cell. He was denied the opportunity to work. I understand that Massachusetts prisoners in disciplinary solitary confinement, for example, sometimes have an opportunity to hold jobs. He was denied any ability to participate in congregate activity, which is a, which is a, which is he's looking for. But I guess if I didn't form the question, if we sent it back for a trial, which is what you want us to do. Yeah. What is the question that you would put to the jury that the jury should be finding facts about with respect to this question? Yeah, well, I mean, obviously, I think because the majority of circuits use general population as the baseline that the court should compare Mr. Perry's solitary confinement to the baseline conditions in general population. But if not, they could compare it to the conditions in disciplinary solitary confinement in any Massachusetts facility. And here are the ways in which it is worse. First, Mr. Perry's solitary confinement, unlike disciplinary solitary confinement, had no fixed term. So while someone in disciplinary solitary confinement might be sentenced to a term of 30 days or six months, Mr. Perry's solitary confinement had no fixed point. So it could have gone on indefinitely. Second, Mr. Perry seems to have had fewer privileges than people in other forms of solitary confinement within the Massachusetts DOC. Third, I think it's notable that Mr. Perry, and now this is specific to him, was mentally ill. And some circuits have taken into account the particular impact of mental illness or physical handicap on a person who is in solitary confinement. Now, of course, you could say that, well, that fades away when you're comparing the baseline to someone else who is similarly situated physically in solitary confinement. But I think it's still an important point. Now, Mr. Greenfield, on that point, it may very well be important. But I understood the defendants saying that even in the conditions in which he was kept under their rules, he could be released from those conditions in order to receive mental health treatment. Is that, have I misunderstood? No, I think that it was well within the defendant's power to order him to or to send him for mental health treatment. I think I may not be understanding the question. I apologize. Well, you seem to be suggesting that there was a denial of treatment. And I understood the defendants to say no treatment was available to him. Oh, I'm sorry, Your Honor. No, I was not suggesting that defendants denied him mental health treatment. I was merely saying that the conditions, the atypicality analysis should take into consideration whether it is atypical and significant for a particular person. Okay, so it again goes back to the sort of individualization as to the nature of the prisoner and his ability to comprehend things. It's sort of where you started here. Right? Well, yes, go ahead. I'm sorry, Your Honor. You seem to be saying that it needs to be tailored more to the conditions of the particular prisoner. Due process requires that. Well, what I think I'm saying is that due process requires an examination of the conditions of confinement. And one of the conditions of confinement in this case was that Mr. Perry was a very mentally ill person held in solitary confinement for a prolonged period of time. And I think that any reasonable prison official, after reading Wilkinson, would know proceed cautiously. At a certain point, a liberty interest will accrue and meaningful process is necessary. The last question I asked you was about how you want us to think about the timing of the hearing in relation to the durational nature of the liberty interest that you're claiming. Yes. I'm sorry, Judge Barron. Turning back to that, I think that some courts, like the Second Circuit, have set bright line rules. And there in the Second Circuit, anything over 305 days requires process between 150 and 305. Okay. No, no. I understand that that's the duration that is necessary to trigger the liberty interest. My question is, how do you want us to think about when the hearing must be held by? In Hewitt, the hearing was held in Sandham relatively early on. And if I look at the DDU regs and the DSU regs, even though you can be held for six months, they say the hearing has got to be within 30 days for DDU or for DSU and the DSU. LeChant seems to suggest that there's no hearing needs to be held for 90 days. And I guess what I'm trying to get a sense of, is the time by which the hearing must be held coterminous with the duration of the confinement that triggers the liberty interest? Or is it the case that there needs to be a hearing as soon as practicable? And then if it turns out you're released earlier, well, maybe you were just released earlier, but you can't, just because you, you know, it's a problem to hold you for a year, therefore we don't have to have the hearing for a year. Do you have a view on that? Your Honor, I do. A prudent correctional official would hold the hearing as soon as practicable after assignment to solitary confinement because it is, a liberty interest could accrue immediately. Would a constitutionally compliant officer have to do that? Well, probably not on day two or day one, but if you look at Wilkinson itself, that case involved a class of prisoners transferred to Ohio State Penitentiary. They were reviewed initially and then 30 days later and then a year later. The Wilkinson court seemed to suggest that the liberty interest accrued immediately upon arrival at OSP and thus that the 30 day, the day of arrival hearing and the subsequent 30 day hearing satisfied the due process clause. 90 days feels like a lifetime when we're talking about these conditions of confinement. So it strikes me that the appropriate line should be drawn earlier to be constitutionally compliant given what we know about solitary confinement and how quickly, how quickly its clutches can run roughshod over people. So should there be a bright line or is it as soon as practicable from your perspective? I think that from my perspective, a bright line is easier to administer. And that certainly was the view of the Second Circuit. But I think since the Second Circuit set its bright line at 300 days in some circumstances earlier in others, we've learned much more about the ravages of solitary confinement, including the physical injury that it imposes. So I think a bright line is probably most administrable and I believe, but I think the LaChance court set that out too far. I think something like the, you know, sometime within the first week would be appropriate. Any further questions? Okay. Thank you. You reserve time for rebuttal. Thank you. Thank you, Attorney Greenfield. At this time, if you could mute your audio and your video, and Attorney Grant, if you could unmute your audio and video and introduce yourself on the record to begin. Good morning. May it please the court, Cheryl Grant for the Massachusetts Department of Correction Defendant Appellees in this case. This court should affirm the judgment below because the court properly allowed defendants motion for summary judgment. And in particular, here, one of the main issues on appeal is allowance of qualified immunity. And here, the defendants in the facilities in the case below, they conducted informal reviews of Mr. Perry's status in accordance with a regulation that's been in effect, 103 CMR 423. Could I ask us to pause? Mr. Greenfield has left the meeting by accident. One moment. Sure. I'm sorry to interrupt. Thank you, Dan. You can pause the stream if you want. Attorney Greenfield, you're back in the meeting. If you could go ahead and mute your camera and your audio, you've only missed a few seconds. Chief Judge Farron, we're ready to go, I think, if you are. Okay, go ahead. Okay. And so they reviewed Mr. – informally reviewed Mr. Perry's status in accordance with that regulation and DOC – So an informal review that doesn't give the inmate notice of what exactly the status problem is, how is that meaningful? Well, under Hewitt v. Helms, which at that time was really the only case regarding this type of process for these particular types of placements, the requirement was that officials had to engage in an informal, non-adversary review of the information supporting the confinement, including whatever statement the person wished to submit. And here, Mr. Perry, by – as evidenced by – But Hewitt specifically says, notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. So that's the specific language of Hewitt, notice of the charges against him. Well, here there were no charges. There were no – he was not charged with a disciplinary offense. At the time when he was placed in there, officials at the prison had received an informant letter providing specific information that Mr. Perry had reportedly stated regarding STG-related concerns, indicating that he intended to assault a particularly named inmate as well as inmates from a particular security threat group.  And they were in context of information known to those officials of Mr. Perry's engagement in STG-related activities in the past, which included being found guilty and Mr. Perry in fact pleading guilty to a security threat group-related assault where he stabbed another inmate in the neck. And Mr. Perry in this case stated in subsequent letters as well as in his facts in the court below that he was told by a correctional program officer that he was being – that he was placed in there for security threat group-related activities. And while I agree with Attorney Greenfield, the record doesn't state the precise date when he was told the informant information. Mr. Perry himself wrote a letter to one of the defendants in February of 2011 where he specified that he was told by an inter-primary security officer that there was informant information received. So – and Mr. Perry also, like I said, indicated and did not dispute that he was told by a correctional program officer before his classification hearing, the December 2010 classification hearing that he was told that was security threat group-related activity. And so the facility, in light of the information of potential danger, they have an obligation to protect all inmates in their custody. And I don't – it sounds like – I don't think Mr. Perry's counsel is disputing, at least initially, that there was a – that there was something improper with that placement. And the – in terms of qualified immunity, you know, the parties didn't really argue below into the substance or delve into what specific process may be required in the future, but that, based on the state of the law at that time, that the defendants could have reasonably concluded, even if this court were to decide it was mistaken, that at that time in 2010, in the related time, that based on the current state of the law, it was not beyond debate, one, that a liberty interest existed, or two, that the process that they gave that was in accordance with a – with a duly promulgated regulation – Counsel, on that last point, can you tell me, for my own edification, what, if anything, in the record that we have before us describes the regulatory or statutory standards that the other states – not Massachusetts, but the other states in our circuit – have in place for the provision of due process in circumstances similar to this? And so – and then second, if the record doesn't reveal that, is there anything that you know of that you can – are willing to share with me for my own edification for comparison purposes? I don't – Before you answer, are my colleagues able to see Ms. Graham? Yes. You are? Yes. Okay. For some reason, I'm not – Chief Judge Barron, I had to switch to large gallery in order to see her. Okay. Okay, continue. I'm sorry to interrupt. Keep going. Yes, Your Honor. I'm not – I don't believe that there's anything in the record in this case regarding what any other jurisdictions may have done in terms of – at current time, certainly since the Lachance decision issued from the Supreme Judicial Court, the – Yes. I'm talking about now. Thank you. Yes. Yeah. So the Department of Correction has current regulations. It's the same regular 103 CMR 423. That's obviously a promulgated regulation, so that differs from – when you look in the record in this case, the 423 that was then in effect is part of the record. So it differs, and that incorporates, amongst other things, the requirements of Lachance. And there are – since that time, they weren't in effect then, but there are numerous in Massachusetts statutory changes have been made in regard to reviews, placement reviews. But, counsel, just sticking to my question, is there anything that you – I take it there's nothing you want to offer with respect to your knowledge about the other states within our circuit, their current regulations or statutory standards? Yeah. I'm not aware of that. Okay. Good. That's good. Thank you. I'm sorry. And so – Judge Kava, did you have a question? Yeah. Well, we're talking about the record. Is there anything in the record or materials that are judicially noticeable that would give us a sense of what's the rough ratio in Massachusetts of general population prisoners to prisoners who are in segregated units? I don't believe from that timeframe that was of relevance there that there was anything subject to judicial notice. Currently, the department publishes on public websites the data and numbers as to the inmates who are in restrictive housing units. Just in the course of where the department has changed its terminology in terms of special management units at the time, they're now called restrictive housing units, if the court were to look at those. And obviously, the population of the prison, there is information in the record as to – I at that time, but I don't believe it contained information as to the specific numbers. And there were different types of – different forms of restrictive housing. In fact, one of – I don't recall which one of the judges inquired earlier. The departmental disciplinary unit, that's a disciplinary unit that's located on the grounds of Cedar Junction. And then the special management units, or the SMUs, has been in effect. The department did not then operate what are referred to as DSUs at that time, so there was nothing in the record other than affidavits that the department was – that those facilities were not currently utilizing DSUs. Just one follow-up on that. What's the status of Cedar Junction and what will replace it? If it closes? Yeah, as far as I'm aware, there was a press release that was reported that Cedar Junction – there's going to be plans to close the facility. As a whole, the DDU will be one of the last things to close. And then there's a behavioral management unit, which is referenced in that release. The behavioral management unit is a separate unit there. It was primarily for divergent inmates identified with serious mental illness from long-term types of restrictive housing who otherwise might have gone to the DDU. So those will eventually be moved. I don't think the precise parameters of where those units will go. Certainly, the department, as noted in there, is moving toward actually eliminating forms of restrictive housing. Mr. Gray, can I take you back to when you were describing the basis for the decision to place the petitioner in the segregated unit? And I didn't hear you describing how much of that information that you were describing as the basis for the decision that was conveyed to him at the December 17th hearing. Yeah, the record does not reflect that he was told all the specifics of all the information. I can imagine maybe not all of it, but I guess I'm really curious how much of it. You just described the basis for it. My understanding from your opponent and from the record was that he was told there was an STG-related basis for it. Was he told anything more than that? It's not clear the precise date on which he was told, but he was told, as I indicated, because he actually states he was told so in his own letter, that he was informed that there was informant information as well. Was that at the December 17th hearing? The precise date isn't given, so I think it's not clear if it was before or after that hearing. So I would say that the record on that, it may have been after the classification hearing in terms of that point. How does that help him at all? What notice? I mean, there's informant information. Suppose he's innocent and you tell him the reason we're doing this is informant information. He'd have no idea what to say. He'd have no idea how to defend it. He'd have no idea how to be heard. How does that convey any information to him if we presume that he's innocent? Mr. Perry, at that point, he wasn't being charged with an offense. He was being held while they could investigate the allegations therein. Certainly the safety and security concerns, sometimes the individuals may not be able to be told the specifics, but Mr. Perry certainly, him, his attorney, there were also many advocacy organizations, prisoners' legal services. Stay with the question for a second because I think it's important. How, if he's sitting at the hearing and someone says we're going to reclassify you based in part on informant information, how does that give him any notice at all that would enable or facilitate him in an effort to argue that he shouldn't be reclassified? I mean, what the record shows is that Mr. Perry, in fact, that he did speak to Mr., the Superintendent Dicko, he and his attorneys challenged various issues regarding a security threat group identification or involvement, and in fact, he, you know, even though he may not have known all the specifics, he did contest, in fact, that he claimed that he was not involved in any security threat group-related activities, so therefore, you know, whatever information may have been conveyed- Let me put it this way. Let me put it this way. Someone just told me, they gave me a reason why you should lose this case. What do you have to say in defense of that? I'm sorry, I don't think I understand the question. Sure. Someone just told me a reason why you should lose this case. What's your counterargument? My arguments would be pointing to reasons why I should not lose this case. But you have no idea how to rebut that reason. That's my point. Well, he knew that was security threat group-related, and therefore, he was able to speak to, because the officials didn't believe that that alleviated the potential risk, doesn't mean that he was deprived of that opportunity. And he, in fact, I would suggest that the record is replete with him and his attorneys and prisoner's advocacy organizations submitting arguments and information alleging that he was not involved in security threat group-related activity. And certainly, it isn't something that- Let me ask you this. Since LaChance, when you're classifying an inmate, is it your position that telling someone that there's a security threat group problem in general satisfy the requirements under LaChance? No. Under LaChance, within 90 days of the placement, there has to be prior notice. It still doesn't specify- So that's what she said? Of what? What kind of notice do you think after LaChance is required? I think, well, the case doesn't get into the specifics in every scenario, obviously. So when you're dealing with something like informant information that may have- Five minutes remaining. Five minutes. But I guess the simple, is it enough to say under LaChance that the reason you're being reclassified has to do with security threat group-related issues? Is that the state's view? In a certain view, depending on the circumstances, it might, if there's safety security concerns for which they might not be able to, the inmate also has to serve written notice. Would that mean then that that would be a factual question for a jury, whether it was complied with notice, whether you actually had a basis for giving that minimal notice? I mean, I understand the point you're making, which is maybe it's justified in some circumstances to give that minimal notice, but then that would be an issue for a jury as to whether you had a good enough reason for doing it. Wouldn't it? I suppose theoretically it could be. I think here the issue, though, is we were arguing qualified immunity and whether based on what was done here, whether the defendant- There's two different issues. There's what the due process right is, and then there's whether it was clearly established. And I'm just trying to figure out, first of all, what you currently think the state's position is as to what due process demands. It sounds like you're now saying that you might have a contingent ability to give that minimal notice, but that you don't have a general due process right to give, a general right under the Due Process Clause or authority in the Due Process Clause to give as a general matter or something that they encountered as notice. Am I misunderstanding you? No, I guess I just want to- I just don't think that the state of the law under any state of law specifies exactly how much detail needs to be put into any type of notice. So here, you know, saying that- Isn't the question of whether it's meaningful notice what is clear? And I thought that was generally understood to be a factual question for the jury, whether the notice is meaningful. Yeah, if and when the notice is required and what the meaningful notice must be, yes. Okay. Now, going on to whether it's required, that then takes us to the liberty interest. Right, and yes. And, you know, and I think to answer, I think it was your question earlier, I think that the state of the law, I would say, is still unclear as to, one, even when a liberty interest exists, when exactly is that first review required? Because under Hewitt, you know, it was utilizing a liberty interest analysis based on regulatory language, so it was found up front. Whereas with a later liberty interest, it's not entirely clear. I would say exactly when that would have to take place. Under Hewitt, it was a reasonable time after placement. At least it's got to be within the time period by the time that the liberty interest is triggered. Correct, yes. Yes, absolutely. Okay, so with respect to whether the liberty interest was triggered here, what is the state's understanding of the baseline that plausibly could have been the baseline at the time of these events that would have indicated that this length of detention in these conditions did not trigger a liberty interest? At that point in time, during the time of these two placements, and really even as of today, the baseline of comparison had not been established. And what was the plausible baseline that you could have been relying on that would have made it reasonable to think that it was permissible to hold somebody without a hearing for this length of time in these conditions? There were different baselines. The DDU would have been one possible baseline. So if you compare it to the DDU, I had thought in the DDU, there was a six-month cap absent extraordinary circumstances. Is that wrong? No, the DDU, because it's a disciplinary matter. I'm sorry. I was thinking of the DSU. So the DSU would have been a six-month cap. Isn't that right? No. A DSU potentially was for the duration of an inmate's confinement, the whole entire confinement of sentence. I thought there was a hearing right after six. There was a hearing within a certain period of time that there was a six-month cap except for extraordinary circumstances. Is that wrong? As to the hearing, yeah, they had different hearing requirements. Yes, that's correct. I thought you were asking about the possible duration of the placement. I'm talking about hearingless confinement in these circumstances. Yes, and that was decided under state regulations. Yes, they had hearing requirements. So I'm just trying to figure out what was the baseline the state could have been operating on at the time? What would have been in its head as a plausible baseline that would have led it to think you could hold somebody for up to a year with no hearing in effective solitary confinement? The baseline is whether or not there's a liberty interest. I know that. The test is clear that if it's atypical confinement, the liberty interest is triggered. You are right that it was not entirely clear what the baseline was for which to measure whether it was atypical. But we know that if there's no plausible baseline in which it would be ordinary to do this, then the liberty interest attaches. That's what Wilkinson teaches. So I'm just asking you, what was the baseline that was plausibly the one you were relying on at that time that would have made it reasonable to think you could hold somebody for a year in these conditions with no hearing? The possible baseline would be comparing the conditions of the particular SMUs  and the conditions of the DDU. These were all DDU, DSS. But is there a baseline in which, if those are the baselines, you could hold somebody for a year with no hearing in these conditions? Well, I would suggest that the department didn't operate without any reviews. I understand. If we disagreed with you about whether you got a hearing, What would be the baseline that would suggest it would be typical to be held this long in these conditions without a hearing? Is there one? I think it would have been other SMU placements throughout the department. But I thought there wasn't authority under the SMU placements to hold somebody for a year without a hearing. The 423 regulation applies to the SMU placements, which talks about the informal reviews. It's within 72 hours of placement. It has to be reviewed by a superintendent. Don't you have to provide notice of the reason for the classification? Under the regulation, it did not require written notice to the inmate prior to those reviews, no. And how long could that kind of – was that confinement identical to the solitary confinement issue here? I'm sorry, that was an issue here. Yes, he was held. No, no. Was that type of confinement – I'm just asking, was it typical for someone to be held up to a year with no hearing in this type of confinement? I guess I would suggest that there was no hearing. Informal reviews were conducted, and that was what was typically done, and that would be the baseline. Hewitt v. Holmes did not require a hearing. It required reviews. And under the qualified immunity analysis, that is the defendant's argument that they could reasonably rely upon. And so at that time, under the 423 regulations at that time, in all the SMUs, that was what the baseline was. And in terms of DDU placements, once an inmate was in there, there were no subsequent reviews after the inmate was first put in there, whereas in SMU placements, they continued throughout – it wasn't until the placement ended. And in practice, like in here in this case, these facilities actually conducted them three times a week, and that based on the state of the law at that time, that the defendants could have concluded that that sufficed. And Hewitt didn't specify a manner in which notice was to be given, and it was undisputed by Mr. Perry himself that he spoke with the individuals, including some of the defendants at the facilities, about his reasons for placement during rounds, when they came around, as well as through correspondence at that. But Hewitt talked about notice of charge, and I understand that this is not a disciplinary proceeding, but just to pin this down, your position is that general notice that there's a security problem with this particular inmate is constitutionally sufficient under Hewitt? I'm arguing that at the time that the defendants could have reasonably concluded that based on the language in there. It says some notice. Hewitt didn't delineate what that meant, how it was to be done. And it didn't specify that it had to be done in a particular manner or how much detail needed to be included in there at that time. And so that's why the defendants were arguing qualified immunity based on that language and the practice that had been in accordance with regulation and followed through all the time. I guess one problem I'm having is that you're saying that even since LeChant, that's enough. And so there's going to be a forever position that the government was not sufficiently notified of what the right was. I mean, the government is going to be forever allowed to say qualified immunity because it wasn't clearly established. No, under LeChant, you have to get notice that it has to be done within 90 days. It's also written notice. But written notice of what? Of the reason for the placement and what the nature of the threat is. And can that mean that STG related is enough? Just being in an STG or in and of itself wouldn't be enough. There has to be some threat tied to that. Because certainly as the record shows here, there's individuals who were validated as STG members throughout the department. That doesn't mean that all of a sudden that there's a threat just because of that. It has to be tied to a specific incident or issue that's under. So just, yeah, I would agree, yeah, just someone's in an STG, certainly no, that would not be sufficient. That there would have to be some type of notice to answer a question about, you know, after a chance as to the threat that's tied to that. And that is what has to be in that notice. Counsel, if I could ask, just follow up a little bit on the qualified immunity issue. Assume for all purposes of my question that everybody has qualified immunity for these facts. But with these same facts prospectively, if they were going to have identical facts happen again prospectively, would you still be arguing that there's qualified immunity or prospectively, no, this will never happen again? No, because under that and applying what chance, you'd have to get written notice. I think we'd have to detail the nature of the threat. And then there has to be, and that one, what chance actually does require a hearing as opposed to just a non adversary review. So within 90 days and every 90 days thereafter, there's actually a hearing in which the individual has the, he has the opportunity whether to appear in person or not. So that's up to the, up to the inmate. And then they have to get a written decision after that. So, so the process is, is much changed. So prospectively, prospectively speaking, similar facts or same facts, no officials would be getting qualified immunity. Prospectively, correct? No, not if they hadn't conducted a hearing with that written notice. No, I don't. You're saying that just because of the chance, correct? Not because that's the state's view of what due process clearly requires. Am I misunderstanding? No. Well, that is the stick through is that is what federal due process now is result of the chance that those specific pieces of it. Yes. Establishing a 90 day liberty interest as well as the, the written notice that has to be served prior to the, the, the hearing. I'm saying is that if you were arguing, do you, are you to us, we should adopt the chance rule as the federal court tool. I guess that's up to the court. I, I, you know, what other strengths or weaknesses of that case may exist. I think, you know, it's helpful in that it provides a guideline or not a guideline, a, a set time. Well, do you feel that it's not constitutionally required? I'm sorry, that what is it? Do you feel that the chance is not constitutionally required? In other words, and Wilkinson, they, they talked about, I'm sorry, they talked about it was sufficient sufficient. And so I'm, there's a difference between what might be provided and thus sufficient as opposed to what's constitutionally required. So I'm trying to figure out if you think that the chance principles are constitutionally required or they are sufficient, but not necessarily required. I understand. If I understand your question, I think that they are constitutionally sufficient. Sort of like in Wilkinson, the Supreme Court ultimately didn't hold precisely in that scenario what, what process was required, but they certainly found it was, it was sufficient. And in some respects, I would submit that what chance goes above what, for instance, what Hewitt had in, in that it requires an in-person hearing, written notice prior to that hearing when the, and it also sets forth a bright timeline of 90 days for liberty interest. So, so in, in some respects, I view it as a high higher floor in some respects than, than Hewitt had set at the time. So I, so I, I think I understood your brother to say that one week would be the more appropriate time as opposed to 90 days. And I took from that that maybe there was some, if there were going to be a bright line, I'm not saying there should be, but if there were going to be, that it might be somewhere between one week and 90 days, you think it could be beyond 90 days in the ordinary case? I would suggest that the chance 90 days is on the short end of pretty much any case that you could find elsewhere in terms of establishing a liberty interest and to tie, I guess, the notice or the process to a time when there's not a liberty interest doesn't necessarily. Well, how about this example? You're in a disciplinary proceeding and the disciplinary proceeding says you're going to be spending 24 months in solitary. Now, when do I have to have the hearing? When there, when there's a disciplinary proceeding under Wolf, if there's a liberty interest that has to have, that happens beforehand. That's a separate, separate type of process. I'm not talking about the good time credits or anything. I'm just saying, even if I did it as a waiting action, I say, instead of giving a, or I do it under the SMU process or whatever other process, instead of giving a, you know, some uncertain date, indefinite date, I give a fixed date, 24 months, you're going to be in solitary. But what time do you think as a due process matter, do I have to have the hearing? Can I wait for a year before I hold the hearing? No, under a chance that would have to be done before, within 90 days. And then we do them every 90 days thereafter as well, to ensure that there's periodic informal reviews. Can I ask a follow-up question with respect to that? So, I mean, I understand that you have cases like Skinner where, you know, there's something about the detention that might suggest a different sort of liberty interest other than being removed from the general population. But other than those kinds of cases, isn't Rody our governing law? I mean, LaChance doesn't change our governing law. And I thought it might be fair to assume from Rody that there needs to be a hearing within a reasonable time. And it doesn't sound to me like even 90 days would be reasonable. Just following up on Judge Barron's point. Well, I mean, certainly I think he would require that it needs to be within a reasonable time when there's a liberty interest. So that's Hewitt. And I'm talking about our precedent, which also applies. Correct. I'm not aware of a case, though, specifically holding that in regards to this type of placement that's at issue here in terms of notice that might be ordered. You know, I'm not sure that this is the case to specifically get into the merits where the only issue at least here was for qualified immunity on these points. You know, and it really wasn't delved into below in terms of that aspect of it. I'm certainly not aware of other cases that tied notice when there's not a liberty at a period in time when there's not a liberty interest. I just have one last question, which is, is there anything in the record or do you have any insight into how likely it would be for a person with a sentence for a crime like Perry's to be held in this type of restrictive custody for a year without getting a hearing first? Would that be something that would be pretty typical? Most prisoners would probably endure something like that, or is that pretty unusual? Yeah. Well, I don't think the record, I don't think, had the data or numbers to specifically speak to that. But as a general proposition, you know, sort of as the regulation and really the affidavits, that it's any inmate, regardless of what his or her underlying criminal sentencing might be. I know any inmate could be. I'm just saying how typical would it be that an inmate would be subjected to that length of detention like this? I mean, here what the record shows is that once he was identified as being screened for out-of-state placement, that as a general proposition for all inmates, and again, regardless of what the underlying sentence might be, that that can take a longer period of time because it's dependent on what other states, whether they may or may not. And what's the best record site for that proposition? Do you have it handy? If you don't, you can just follow up with it. Yeah, I believe that Thomas Neville's affidavit in the... Okay. Thank you. Yeah, the out-of-state process and how many inmates in how many different states. His affidavit generally, I believe it was Exhibit 3 to the defendant's staff. Thank you. Any further questions from my colleagues? No. Thank you. I will rest on my briefs. Thank you. Attorney Grant, please mute your audio and video at this time. Attorney Greenfield, you have a five-minute rebuttal. Please reintroduce yourself back on the record to begin. Daniel Greenfield on behalf of Plaintiff Appellant Joannis Perry. I'd like to address four points, if I might, that my friend on the other side raised. First, I want to just clarify that prior to the December 10, 2017 hearing, Mr. Perry did not have notice that he was being held or being placed in solitary confinement for, quote, FPG-related issues. That notice came on March 24, 2011, more than four months later. And that is clear from the record. Prior to the hearing, he was led to believe by Officer Morales that he was being placed in solitary confinement because his underlying conviction was FPG-related, which is why you see him defending against that allegation. So he was defending against the wrong charge. I also want to mention that my friend on the other side has reduced Hewitt to three words. But Hewitt doesn't stand alone. Wilkinson, Greenholz, and Hewitt are the trio of cases that set forth the floor for process. And I want to be clear that Hewitt itself says this. Among the most important procedural mechanisms for purposes of avoiding erroneous deprivation is a requirement that a prisoner must receive notice of the factual basis leading to consideration and a fair opportunity for rebuttal. Greenholz and Hewitt add more. And so defendants are wrong that Hewitt requires only this informal process. While it is informal, it has teeth. And those teeth are clearly elucidated in Greenholz, Hewitt, and Wilkinson. I also want to make clear that for purposes of qualified immunity, first, while Lachance may bind the Commonwealth in the ways that it administers its prison, it does not bind other states within the First Circuit. So Lachance does not stand for the proposition that DOCs throughout the First Circuit need to provide a process when someone is subjected to an atypical and significant hardship. So federal law from this court is necessary on that point. And I wanted to also be clear... Well, on that point, how would you frame, how would you want us to frame what process is due? The process, I think, is that which is set forth in Greenholz and Hewitt. So notice of the factual basis, a fair opportunity for rebuttal, an opportunity to present his views to the official charged with deciding whether to place the prisoner in solitary confinement, a short statement of reasons which would guard against arbitrary decision-making and serve as a guide for future behavior, and then periodic review in a meaningful way and by relevant standards to ensure that non-disciplinary solitary confinement does not become a pretext for indefinite solitary confinement. And those are just flat out, those are just straight from Greenholz, Hewitt, and Wilkinson. So I think that the requirements were clear well before the chance was decided. I'm sorry, in that scenario, you left out a time frame. Would you insert a time frame such as as soon as practicable or not, just leave that alone? So what I would say is that when solitary confinement is or is likely to be prolonged, defendants should offer process from the get-go. So now, perhaps it doesn't have to be on day one, but I think 90 days is too far out. And as I suggested earlier, considering the harm that solitary confinement imposes in days, I would think that 7 to 10 days is probably what the outer limit should be. I want to say one other thing. I was asked earlier about the comparison between the SMU and other forms of solitary confinement within Massachusetts. And I want to note that Lachance itself said that the SMU was more restrictive than the security housing units and more restrictive in some ways than the DSU. So even if this court were to hold that general population is not the baseline, Mr. Perry's solitary confinement was atypical and insignificant under any plausible baseline. And just one last question I have for you. It's a version, maybe I asked it before, but maybe not as clearly. Given the qualified immunities offense that you need to overcome, could you just describe for me the jury instruction you have in mind if we send this back that would enable the jury to find for you and overcome the qualified immunity offense if they read the record as you want it to be read? Sure. The question, Your Honor, I think would be, was Mr. Perry held in restrictive conditions of confinement for a prolonged period of time without the requirements set forth in Greenfield, Hewitt, and Wilkinson? If yes, must rule against defendants on qualified immunity. And with respect to that question, when you're asking it, what is the reason for us to think it would be clear what is meant by prolonged? And how would you do the baseline issue with respect to the jury? Because there's going to be a trial of what you want. Sure. And so I'm just trying to figure out how that's going to operate, given the need to show that there's a clear baseline. Yeah. So, Your Honor, to start with the baseline, I think you would ask the jury to compare it against general population, which is what the majority of circuits have held. But if not, you would ask the jury to compare it against other solitary confinement units in Massachusetts, which the Lipschatz Court did and found the SMU to be more restrictive. Your position is it was at least clear as of the time of this classification that that was the only other plausible baseline, if it wasn't the general population. Is that the idea? There are some circuits that have provided, that have offered sort of hybrid rationales. You can compare it to general population, and you can compare it to... I'm saying that your position, though, is if we ask them to compare it to the DSU, that it was at least clear in your view that if it was more restrictive than that, that it would trigger the liberty interest. Yes, Your Honor. Wilkinson made that clear. In Wilkinson, the baseline was not decided, but it was atypical under any conceivable baseline, and that meant comparison against other forms of solitary confinement within the Ohio State DOC. Okay. Thank you. Thank you, Your Honors. If no further questions, I will rest on my briefs, and I ask this Court to reverse and remand for trial. That concludes the arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the Court. God save the United States of America and this Honorable Court. Counsel, you may disconnect from the meeting.